IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE MUSHROOM DIRECT | : | Master File NO. 06-0620 |
| PURCHASER ANTITRUST | : | |
| LITIGATION | : | NOS.  06-0638; 06-0657; |
| | : | 06-0677; 06-0861; |
| THIS DOCUMENT RELATES TO: | : | 06-0932; 06-1464; |
| All Actions | : | 06-1854 |

O'NEILL, J.                                                    October 14, 2014

## MEMORANDUM

Among the many motions now pending before me in this antitrust litigation is a motion

seeking reconsideration of my March 26, 2009 decision addressing plaintiff's claims under § 1 of

the Sherman Act.[1]  Dkt. No. 513.  Moving defendants were individual members and affiliates of

the former Eastern Mushroom Marketing Cooperative (EMMC).[2]  For the following reasons, I

---

[1]       Defendants' motion for reconsideration also seeks partial summary judgment on
behalf of Gaspari Bros. Inc., Sher-Rockee Mushroom Farm LLC, LRP Mushrooms, and John
and Michael Pia for the reasons they previously asserted in their July 1, 2008 Memorandum of
Law in Support of Certain Defendants' Motion for Partial Summary Judgment (Dkt. No. 245).
Dkt. No. 513 at p. 2.  I denied their prior motion without prejudice to refiling after the
completion of discovery.  See In re Mushroom Direct Purchaser Antitrust Litig., 621 F. Supp. 2d
274, 282 n.6 (E.D. Pa. 2009).  I will decide their request for partial summary judgment on the
basis of their prior arguments in a separate decision.

Also now pending in this litigation are a number of other motions, including plaintiffs'
January 6, 2014 motion for class certification of the alleged injured class, Dkt. No. 514, and the
parties' numerous submissions related to that motion, defendants' motion for adjudication of
plaintiffs' claims under the Rule of Reason, Dkt. No. 492, plaintiffs' cross-motion, Dkt. No. 495,
and defendants' motion for summary judgment on plaintiffs' claims, Dkt. No. 518.

[2]       Moving defendants are:  Robert A. Feranto, Jr. t/a Bella Mushroom Farms;
Brownstone Mushroom Farms, Inc.; Brownstone Farms, Inc.; Brownstone Mushroom Farm; To-
Jo Fresh Mushrooms, Inc.; Country Fresh Mushroom Co.; Gino Gaspari & Sons, Inc.; Gaspari
Mushroom Co., Inc.; Kaolin Mushroom Farms, Inc.; South Mill Mushroom Farms, Inc.;
Southmill Mushroom Sales, Inc.; Modern Mushroom Farms, Inc.; C&C Carriage Mushroom Co.;
Sher-Rockee Mushroom Farm, LLC; Oakshire Mushroom Farm, Inc.; Phillips Mushroom Farms,
Inc.; Louis M. Marson, Jr., Inc.; Monterey Mushrooms, Inc.; John Pia and Michael Pia (Dkt. No.

will deny moving defendants' request for reconsideration[3] and will certify my Order for appeal.

## BACKGROUND

The Capper-Volstead Act provides certain agricultural cooperatives with a limited

exemption from antitrust laws.  See 7 U.S.C. § 291.  In their consolidated amended class action

---

513).  JM Farms, Inc. (Dkt. No. 523), M. Cutone (Dkt. No. 524) and Franklin Farms, Inc. (Dkt. No. 531) also join in the motion for reconsideration.

[3]      Defendants filed this motion on January 6, 2014.  They seek reconsideration of my 2009 decision based on their contention that the decisions in American Needle Inc. v. National Football League, 560 U.S. 783 (2010), and Deutscher Tennis Bund v. APT Tour, Inc., 610 F.3d 820 (3d Cir. 2010), have effected an intervening change in law warranting reconsideration.  These decisions were issued more than three and a half years ago and plaintiffs argue that defendants' motion for reconsideration is untimely.  Defendants counter by explaining that they delayed in filing this motion since "Phase II discovery was ongoing" and "the Court had entered a stipulated Scheduling Order that required the parties to wait until all fact and expert discovery was completed before filing summary judgment and other substantive motions" by February 11, 2014.  Dkt. No. 552 at Mem. p. 2.

Notwithstanding defendants' assertion of the unrelated motion for partial summary judgment in conjunction with their motion for reconsideration, see Dkt. No. 513 at p. 2, the issues in defendants' motion related to the applicability of the Capper-Volstead exemption were not the subject of Phase II discovery.  Defendants therefore should have brought their motion for reconsideration based on American Needle and Deutscher Tennis Bund after the Court of Appeals lifted its stay of this matter on September 30, 2011.  However, in the interests of justice, I will consider defendants' argument that an intervening change in law now necessitates reconsideration of my prior interlocutory decision denying defendants' motion for summary judgment on the issue of Capper-Volstead immunity.  See Fed. R. Civ. P. 54(b) (An order that does not dispose of every claim in an action "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties rights and liabilities."); see also Pellicano v. Blue Cross Blue Shield Ass'n, 540 F. App'x 95, 97 n.4 (3d Cir. 2013) (finding that where the District Court's order was not a final judgment, the plaintiff's motion for reconsideration was "was nothing more than an interlocutory motion invoking the district court's general discretionary authority to review and revise interlocutory rulings prior to entry of final judgment . . . . ") (citation omitted); Mohammad v. Kelchner, No. 03-1134, 2005 WL 1138468, at *2 (M.D. Pa. Apr. 27, 2005), quoting United States v. Jerry, 487 F.2d 600, 605 (3d Cir. 1973) ("The court may reconsider an interlocutory order whenever it is 'consonant with justice to do so.'").

complaint, plaintiffs allege that:  (1) certain defendants were members of defendant EMMC but were not engaged in agricultural production; (2) defendants entered into multiple agreements with persons or entities not engaged in agricultural production; and (3) defendants engaged in anticompetitive and predatory practices that fall outside of the legitimate objects of an agricultural cooperative.  See In re Mushroom Direct Purchaser Antitrust Litig., 514 F. Supp. 2d 683, 694 (E.D. Pa. 2007).  Any of these allegations, if proved, would place defendants outside the Capper-Volstead exemption.  Id.

On March 26, 2009, I denied certain defendants' motions for summary judgment and plaintiffs' cross motion for summary judgment on the issue of Capper-Volstead immunity.  I found that the inclusion of a non-grower distributor, M. Cutone, in the EMMC's membership was sufficient to destroy defendants' Capper-Volstead immunity.  I also found that, even if all EMMC members had satisfied the requirements to qualify the cooperative for Capper-Volstead immunity, the Act's exemption did not extend to protect cooperatives that conspire with entities not engaged in agricultural production as such was the case with Kaolin/South Mill and its distribution entities and LRP-M/Manfredini Enterprises.[4]  In re Mushroom Direct Purchaser Antitrust Litig., 621 F. Supp. 2d 274, 289-90 (E.D. Pa. 2009).  My two separate findings constituted independent grounds for denial of the Capper-Volstead Act's exemption to defendants.

I denied defendants' request pursuant to 28 U.S.C. § 1292(b) to certify my Order for appeal.  Dkt. No. 315.  Defendants then filed an interlocutory appeal that the Court of Appeals dismissed on August 23, 2011.  The Court of Appeals held that a prejudgment order denying the

---

[4]     I did not address defendants' third argument as I found that defendants were not able to defeat plaintiffs' first and second arguments.  See infra, note 11.

protections of the Capper-Volstead Act was not a collateral order subject to interlocutory appeal. In re Mushroom Direct Purchaser Antitrust Litig., 655 F.3d 158, 167 (3d Cir. 2011).

Moving defendants now argue that the Supreme Court's decision in American Needle, Inc. v. National Football League et al., 560 U.S. 183 (2010) and the Court of Appeals' decision in Deutscher Tennis Bund v. ATP Tour, Inc., 610 F.3d 820 (3d Cir. 2010), have created an intervening change in the law relating to the single entity enterprise defense, warranting reconsideration of my March 26, 2009 decision with respect to the South Mill mushroom distributors, Manfredini Enterprises and M. Cutone on the availability of the Capper-Volstead exemption.  Dkt. No. 513, Mot. at pp. 2-3.

Moving defendants also contend that reconsideration of my prior decision is warranted on the basis of an issue that my prior opinion did not specifically address:  whether individual members of the EMMC should lose their Capper-Volstead antitrust exemption when they acted under a good faith belief that the EMMC was properly constituted.  Dkt. No. 513, Mot. at p. 1.

## STANDARD OF REVIEW

"The scope of a motion for reconsideration[ ] is extremely limited."  OR v. Hutner,  No. 13-2102, 2014 WL 3937715, at *2 (3d Cir. Aug. 13, 2014), citing Blystone v. Horn, 664 F.3d 397, 415-16 (3d Cir. 2011).  The party seeking reconsideration must show at least one of the following: "(1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion for summary judgment; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice."  Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros, 176 F.3d 669, 677 (3d Cir. 1999); Lazaridis v. Wehmer, 591 F.3d 666, 669 (3d Cir. 2010) (per curiam).  In a motion for reconsideration, the burden is on the movant . . . to show 'manifest' errors of law or fact or new evidence."  Egervary v. Rooney, 80

F. Supp. 2d 491, 506 (E.D. Pa. 2000) (citation omitted).  "[A] motion for reconsideration

addresses only factual and legal matters that the Court may have overlooked.  [It is improper] to

'ask the Court to rethink what [it] had already thought through—rightly or wrongly.'"  Glendon

Energy Co. v. Borough of Glendon, 836 F. Supp. 1109, 1122 (E.D. Pa. 1993) (citation omitted).

"Because of the interest in finality . . . courts should grant motions for reconsideration

sparingly."  Rottmund v. Cont'l Assur. Co., 813 F. Supp. 1104, 1107 (E.D. Pa. 1992).

## DISCUSSION

I.     **American Needle, Deutscher Tennis Bund and the Single Entity Defense**

In order to establish a conspiracy in violation of § 1 of the Sherman Act,[5] plaintiffs must

first establish a "contract, combination . . . or conspiracy" as "Section 1 applies only to concerted

action and does not proscribe independent action by a single entity, regardless of its purpose and

effect on competition."  Deutscher Tennis Bund, 610 F.3d at 835, citing Am. Needle, Inc., 560

U.S. at 183.  Concerted action is established where two or more distinct entities agree to take

action against a plaintiff.  Weiss v. York Hosp., 745 F.2d 786, 812 (3d Cir. 1984).

Defendants previously argued that there cannot be an unlawful conspiracy between

EMMC grower members and their affiliated distributors because the members and distributors

---

[5]     My analysis of the single entity/enterprise defense is also applicable to plaintiffs'
conspiracy to monopolize claim under § 2 of the Sherman Act because the same requirement of a
plurality of actors is present.  See Trugman-Nash, Inc. v. N.Z. Dairy Bd., 942 F. Supp. 905, 920
(S.D.N.Y. 1996), on reh'g sub nom, Trugman-Nash, Inc. v. N.Z. Dairy Bd., Milk Prods.
Holdings (N. Am.) Inc., 954 F. Supp. 733 (S.D.N.Y. 1997) ("If plaintiff's [Sherman Act] § 2
claim was limited to an alleged conspiracy to monopolize, the plurality of conspirators
requirement present in the § 1 claim would also apply, and I would approach the issue in the
same way."); Growers 1-7 v. Ocean Spray Cranberries, Inc., No. 12-12016-RWZ, 2014 WL
1764533, at *7 (D. Mass. May 2, 2014) ("[I]f a parent and subsidiary do not provide the plurality
of actors necessary for [Sherman Act] § 1 liability, why do they do so for [Sherman Act] § 2
[conspiracy to monopolize] liability?  I hold they do not" and finding that the plaintiffs' § 2
claim failed because they had not alleged an agreement "between two separate legal persons.").

constitute a single economic unit under <u>Copperweld Corp. v. Independence Tube Corp.</u>, 467 U.S. 752, 771 (1984) and <u>Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co.</u>, 370 U.S. 19, 27-29 (1962).  Therefore, defendants argue, EMMC price fixing is permissible at the distribution level because the plurality of actors required for a conspiracy is absent.  Defendants now make the same argument relying on <u>American Needle</u> and <u>Deutscher Tennis Bund</u> which I do not find persuasive.

In <u>American Needle</u>, the Supreme Court reiterated <u>Copperweld</u>'s central holding that "substance, not form, should determine whether a[n] . . . entity is capable of conspiring under § 1 [of the Sherman Act]."  560 U.S. at 195, <u>quoting</u> <u>Copperweld</u>, 467 U.S. at 773 n.21.  The Supreme Court noted that entity analysis requires a determination of whether the alleged contract, combination or conspiracy joins together separate decisionmakers pursuing separate economic interests such that the agreement "deprives the marketplace of independent centers of decisionmaking and therefore of [the] diversity of entrepreneurial interests, and thus of actual or potential competition."  <u>Am. Needle</u>, 560 U.S. at 195 (internal citations omitted).  It reiterated that it has "long held that concerted action under § 1 does not turn simply on whether the parties involved are legally distinct entities.  Instead, [the Court] ha[s] eschewed such formalistic distinctions in favor of a functional consideration of how the parties involved in the alleged anticompetitive conduct actually operate."  <u>Id.</u> at 191.  "[T]he inquiry is one of competitive reality . . . ."  <u>Id.</u> at 196.

The plaintiffs in <u>American Needle</u> alleged that the defendants violated § 1 of Sherman Act when they granted exclusive licenses to a number of vendors.  The Supreme Court considered the question of whether the National Football League and its various member teams along with the National Football League Properties (NFLP) (formed by the teams in 1963 to

develop, license and market their intellectual property) constituted a single economic entity.

Reaching its decision, the Supreme Court explained that:

> the NFL teams do not possess either the unitary decisionmaking
> quality or the single aggregation of economic power characteristic
> of independent action.  Each of the teams is a substantial,
> independently owned, and independently managed business.  Their
> general corporate actions are guided or determined by separate
> corporate consciousnesses, and their objectives are not common.
> The teams compete with one another, not only on the playing field,
> but to attract fans, for gate receipts and for contracts with
> managerial and playing personnel.

Id. at 196-97 (citations, alterations and internal quotations omitted).  "While [NFL] teams have

common interests such as promoting the NFL brand, they are still separate, profit-maximizing

entities, and their interests in licensing team trademarks are not necessarily aligned."  Id. at 198.

The Supreme Court ultimately found that "decisions by the NFLP regarding the teams'

separately owned intellectual property constitute concerted action" where the NFL teams,

"operating independently through the vehicle of the NFLP are not like the components of a

single firm that act to maximize the firm's profits.  The teams remain separately controlled,

potential competitors with economic interests that are distinct from NFLP's financial well-

being."  Id. at 201.

In Deutscher Tennis Bund, the Court of Appeals noted that although Copperweld did not

"set clear parameters for what constitutes a single economic entity beyond the parent-subsidy

context," it nevertheless "'encouraged the courts to analyze the substance, not the form, of

economic arrangements.'"  610 F.3d at 835.  The Court of Appeals explained that "[t]he focus of

the inquiry under § 1 of the Sherman Act centers on diminution of competition that would

otherwise exist" and cautioned that "formalities [of entity structure] should not detract from the

necessity to examine the economic realities of the restraints imposed on competition by a joint

venture."  Id.  In the context of a professional tennis circuit organized by the Association of

Tennis Professionals (ATP), the Court of Appeals found that an agreement among the ATP's

tournament members in a reorganization of the ATP Tour which downgraded other competing

Federations' tours "might have deprived the marketplace of potential competition" because

"individual tennis tournaments traditionally compete for player talent."  Deutscher Tennis Bund,

610 F.3d at 837.  The Court ruled that "[a]n agreement restricting this competition should not

necessarily be immune from § 1 scrutiny merely because the tournaments cooperate in various

aspects of producing the ATP Tour."  Id.

   Defendants now argue that Kaolin/South Mill distribution centers, as well as LRP-M and

Manfredini Enterprises, each constitute a single entity under the holding of American Needle.

They further argue that applying American Needle to M. Cutone requires me to reconsider my

decision that the EMMC's membership included non-growers.  I do not find defendants'

arguments to be persuasive for the following reasons.

   A.    Kaolin/South Mill

   I previously found that Kaolin/South Mill and its distribution centers cannot constitute a

single entity; American Needle and Deutscher Tennis Bund do not disturb my finding.  John and

Michael Pia had a collective 100% interest in EMMC member Kaolin Mushroom Farms, Inc.

and South Mill Mushroom Sales Inc.  In re Mushroom, 621 F. Supp. 2d at 279. Together, John

and Michael Pia also owned a 50% interest in multiple distribution entities organized to sell

mushrooms grown by Kaolin.[6]  Stuart Thomas owned the remaining 50% interest in the

_____

   [6]    Specifically, John and Michael Pia together owned 100% of Pennsylvania
Mushroom Distribution, Inc. and Mushroom Substrate Technologies, Inc.  Dkt. No. 252 at ¶ 103.
Those two companies held a 50% ownership interest in four South Mill mushroom distribution
companies, respectively located in Dallas, Houston, New Orleans and Atlanta.  Id.  The
remaining 50% ownership interest in the distribution centers was held by Stuart Thomas through

distribution entities.  Dkt. No. 252 at ¶ 104; see In re Mushroom, 621 F. Supp. 2d at 289.  In

September 2005, Thomas filed suit against South Mill Mushroom Sales, the Pias and other

employees of Kaolin, asserting claims of price discrimination and discriminatory allowances

under § 2(d) of the Robinson-Patman Act, restraint of trade under § 1 of the Sherman Act, and

anti-competitive dealing under § 3 of the Clayton Act.  See Dallas South Mill, Inc. v. Kaolin

Mushroom Farms, Inc., No. 3:05-cv-1890 (N.D. Tex. Sept. 23, 2005) (Compl.).  In the complaint

in that action, Thomas alleged that Kaolin/South Mill, operated and controlled by the Pias,

exercised predatory pricing of mushrooms as the sole supplier to the distribution entities, leading

to a "downward spiral" of the growth rate and the profits of entities.[7]  Id. at ¶ 30.

As I stated in my 2009 decision, "the lack of unity of interest is particularly evident with

this affiliation as a lawsuit ensued between Kaolin/South Mill and a distribution center."  In re

Mushroom, 621 F. Supp. 2d at 289.  I again conclude that Kaolin/South Mill and its distribution

entities are separate decisionmakers pursuing separate economic interests as is evidenced by the

suit between them.  Their relationship "is one of competitive reality" lacking the "complete unity

of interest" and does "not possess either the unitary decisionmaking quality or the single

aggregation of economic power characteristic of independent action."  Am. Needle, 560 U.S. at

195.  I reiterate that "[i]t is hard to imagine how interests could have been congruent and control

exercised to constitute 'one consciousness' when litigation occurred between the entities."  In re

Mushroom, 621 F. Supp. at 290.  Therefore, I find that Kaolin/South Mill and its distribution

centers cannot constitute a single entity under American Needle and Deutscher Tennis Bund.

---

his ownership of Thomas Mushroom Distribution, Inc. and Dallas South Mill, Inc.  Id.

[7]        Thomas testified that after "numerous lawsuits" he eventually signed a settlement
agreement with the Pias.  Dkt. No. 252-41 at 14:24-16:12.

B.      LRP-M/Manfredini Enterprises

In contrast, I find on reconsideration that the question of whether LRP-M and Manfredini Enterprises constitute a single entity cannot be resolved on the record now before me.[8]

Mushroom grower LRP-M was owned by Domenic Manfredini and his nephew Lucio Pizzini, each with a 50% ownership interest.  In re Mushroom, 621 F. Supp. 2d at 290.  LRP-M had no employees and was "managed under LRP."[9]  Dkt. No. 252-17 at 24:16-19 (D. Manfredini Dep.).  LRP, a mushroom grower that was not an EMMC member, was owned by Lucio Pizzini and sold all of the mushrooms it grew to Manfredini Enterprises.  Id. at  35:21-36:10.  LRP-M sold all of the mushrooms it grew to Manfredini Enterprises, its affiliated distributor.  Id. at 291.  Manfredini Enterprises was owned by Dominic Manfredini's wife and he served as its president and operator.  Id. at 290.  Although LRP-M sold all of the mushrooms it grew to Manfredini Enterprises, Manfredini Enterprises also purchased mushrooms from growers other than LRP and LRP-M and purchased and sold produce other than mushrooms.  See Dkt. No. 252-17 at 39:23-41:14 (D. Manfredini Dep.).

While the record facts are clear as to the ownership percentages held by the respective parties, the facts are not determinative of whether LRP-M and Manfredini Enterprises are separate decisionmakers pursuing separate economic interests.[10]  See Am. Needle, 560 U.S. at

---

[8]      Phase I of discovery in this matter proceeded and concluded under the controlling precedents of Copperweld and Siegel Transfer, Inc. v. Carrier Express, Inc., 54 F.3d 1125 (3d Cir. 1995).

[9]      Specifically, Manfredini testified that LRP-M "work[s] in conjunction with LRP . . . .  That's why they're tied together."  Dkt. No. 252-17 at 21:19-22:2 (D. Manfredini Dep.).

[10]      My prior decision considered elements of the relationship between LRP-M and Manfredini Enterprises that, after American Needle, are no longer considered to be dispositive in

195, quoting Copperweld, 467 U.S. at 773 n.21.  The record is devoid of facts material to whether the relationship between LRP-M and Manfredini Enterprises was one of competitive reality such that an alleged agreement between them to sell mushrooms at fixed EMMC prices would deprive the marketplace of competition.  See id.  Thus, while the "form" of each entity is clear, their respective "substance" is not.  Id.

However, my finding upon reconsideration that the relationship between LRP-M and Manfredini Enterprises is indeterminate does not alter the outcome for defendants that the protections of the Capper-Volstead Act are not applicable to them.  Because I have found that Kaolin/South Mill and its distribution centers are separate entities capable of conspiracy, defendants cannot rely on the single entity/enterprise defense for protection under the Act.  The exemption does not extend to protect cooperatives that conspire with non-members.[11]

### C.   M. Cutone

I previously found that M. Cutone was a non-grower member of the EMMC and that, despite its affiliation with M&V Enterprises, it had "the power to participate in the control and

---

determining whether they constitute a single entity.  See In re Mushroom, 621 F. Supp. 2d at 290 (discussing the entities' common control structure).

[11]     As plaintiffs correctly point out:

> Although plaintiffs may establish entitlement to summary judgment in their favor by demonstrating defendants' inability to establish any one of the three bases outlined by the Court[: (1) inclusion of a non-grower member in the EMMC; (2) agreement with persons or entities not engaged in agricultural production; or (3) anticompetitive and predatory practices that fall outside the legitimate object of an agricultural cooperative,] defendants must establish as a matter of undisputed fact that none of the three is true.

Dkt. No. 273 at p. 1, n.2.

policy making of the association through voting" which destroyed the availability of Capper-Volstead immunity for the cooperative.  In re Mushroom, 621 F. Supp. 2d at 285.  Defendants now argue that my 2009 ruling with respect to M. Cutone should also be reconsidered in light of American Needle and Deutscher Tennis Bund.  Dkt. No. 513, Mot. at pp. 2-3.  I disagree.

Neither decision, nor Copperweld for that matter, is applicable as a defense to the Capper-Volstead Act's requirement that agricultural associations must consist of "persons engaged in the production of agricultural products," that is, actual producers of an agricultural product defined as "farmers, planters, ranchmen, dairymen, nut or fruit growers."  7. U.S.C. § 291.[12]  Defendants' argument misconstrues the nature of the single entity defense.  In the context of Sherman Act § 1 claims, the doctrine is a defense to a claim of a conspiracy which requires the agreement of two or more entities "in competitive reality" to take unlawful action.  Am. Needle, 560 U.S. at 196.  Merely because two parties are considered to be a single entity for the purpose of a conspiracy claim under American Needle does not require that they be similarly considered in order to determine whether the cooperative's membership included non-growers. The single entity defense cannot be used to circumvent the Capper-Volstead Act's requirement that members of the EMMC cooperative must be agricultural producers.  To allow such a reading would defeat the requirements of the Capper-Volstead Act.

Under the plain language of the Act, M. Cutone, undisputedly a distributor, is not a "person[ ] engaged in the production of agricultural products" regardless of defendants' claim that it is owned by the same people who own M. Cutone's affiliated grower, M & V Enterprises.

---

[12]     The Act additionally requires that each member of the cooperative is allowed one vote regardless of the amount of stock or membership he may own; the cooperative cannot pay dividends on stock or membership capital in excess of eight percent annually; and the cooperative may not "deal in the products of nonmembers to an amount greater in value than such as are handled by it for members."  Id.

In re Mushroom, 621 F. Supp. 2d at 285.  As I previously found, the uncontested nature of M. Cutone's operation and its inclusion in the membership of the cooperative is not a de minimis exception to the Act's requirement because M. Cutone was a non-grower member who had the power to participate in the control and policymaking of the association through voting.  In re Mushroom, 621 F. Supp. 2d at 284-85.  American Needle and Deutscher Tennis Bund are not applicable to my finding.  M. Cutone cannot become a grower for the purposes of satisfying the Capper-Volstead Act's requirements by asserting the single-entity defense in this context.

## II.      Good Faith Reliance on Counsel

Defendants additionally argue that, "notwithstanding [any] defects in the structure of the EMMC," reconsideration of my prior decision is warranted because it did not address whether an immunity from claims under § 1 of the Sherman Act should apply to "agricultural producers who come together in good faith and form an agricultural cooperative based on counsel's advice that the cooperative was properly constituted and could package and deliver mushrooms through affiliated companies to customers . . . ."[13]  Dkt. No. 513 Mem. at p. 1.  They assert that individual members of the former EMMC should not lose their Capper-Volstead immunity where they acted under a good faith belief that the cooperative was properly constituted, and additionally that members of a cooperative should not be held liable for antitrust violations resulting from "structural mistakes made by [the] cooperative, especially when acting upon the advice and assistance of counsel."  Dkt. No. 513, Mem. at p. 4.

Defendants' argument is problematic.  The affirmative defense of good faith reliance on

---

[13]      As defendants argue, this issue was not specifically considered in my 2009 decision.  Dkt. No. 513, Mem. at p. 1.  I note that the good faith reliance on counsel argument was asserted only by M.D. Basciani & Sons, Inc. in its Opposition to Direct Purchaser Plaintiffs Motion for Summary Judgment on Defendants' Affirmative Defense of Capper-Volstead Immunity.  Dkt. No. 276 at pp. 17-18.

counsel is generally warranted only where the offense alleged involves willful and unlawful

specific intent.  See Rhone-Poulenc Rorer Inc. v. Home Indem. Co., 32 F.3d 851, 863 (3d Cir.

1994) (noting that in an action "where a party is accused of acting willfully, and where that party

asserts as an essential element of its defense that it relied upon the advice of counsel," the party

waives attorney-client privilege pertaining that advice); Robin Woods Inc. v. Woods, 28 F.3d

396, 399-400 (3d Cir. 1994) (finding that good faith reliance on counsel was not a defense to an

offense where willfulness was not a necessary element); A. Stucki Co. v. Schwam, 634 F. Supp.

259, 265 on recons., 638 F. Supp. 1257 (E.D. Pa. 1986) aff'd sub nom. A. Stucki Co. v.

Worthington Indus., Inc., 849 F.2d 593 (Fed. Cir. 1988) ("Good faith reliance upon an attorney's

advice may be a defense to liability based upon willful misconduct.").  However, proof of

specific intent is not required in order to establish a civil violation of §1 of the Sherman Act.  See

U.S. v. U.S. Gypsum Co., 438 U.S. 422, 436 n.13 (1978) (noting that while "a defendant's state

of mind or intent is an element of a criminal antitrust offense" the "general rule" is that a civil

antitrust offense can be "established by proof of either an unlawful purpose or an anticompetitive

effect.").[14]  Therefore, because a violation of the Sherman Act does not require proof of specific

---

[14]        But cf. In re Fresh & Process Potatoes Antitrust Litig., 4:10-MD-02186-BLW,
2014 WL 1413676, at *3-7 (D. Idaho Apr. 11, 2014) (granting plaintiffs' motion to compel
documents from specific defendants relating to their defense of good faith intention to comply
with the law and finding that "to the extent illegal conduct occurred, [defendants] acted with the
reasonable belief that the conduct alleged . . . was lawful under Section 6 of the Clayton Act, the
Capper–Volstead Act . . .");  In re Processed Egg Prods. Antitrust Litig., 2:08-MD-02002-GP,
Dkt. No. 1052 (E.D. Pa. Sept. 12, 2014) (M.J. Rice) (ordering certain defendants to produce
withheld documents in support of their asserted affirmative defense that they were immune from
antitrust liability because they believed in good faith that they were complying with antitrust
laws or Capper-Volstead).

intent, advice of counsel would not be a proper defense to such related claims.[15]

Defendants have not directed me to any relevant authority to support their argument to the contrary—that good faith reliance on advice of counsel can be a defense against losing the Capper-Volstead Act's limited immunity to certain antitrust conduct.  I am not persuaded by their argument that the Act's "substantial" legislative history demonstrates that "farmers who voluntarily join an agricultural cooperative under a good faith belief that the cooperative [sic] entitled to Capper-Volstead protection, should not be penalized because of mistakes in the cooperative's organization."  Dkt. No. 552 at p. 6.[16]  Nor do I find that Consolidated Express,

_____

[15]   Additionally, defendants were instructed by their counsel that members of the EMMC must be "'producers,' i.e. mushroom growers and farmers" and were advised that the Capper-Volstead Act affords only a limited exception and does not provide "a blanket immunity from antitrust law."  Dkt. No. 492 (Ex. A).  Counsel also advised defendants that "there is no protection offered by . . . Capper-Volstead if the potentially § 1 offending 'agreement' is entered into with a non-member" and "there is also no protection if the activity engaged in under Capper-Volstead § 1 shield otherwise violates the complex law under § 2 of the Sherman Act . . . ."  Id.

[16]   Defendants support their argument with the following limited set of out-of-context quotations that merely state that the Act allows farmers to take advantage of a certain organizational business structure:

> 61 CONG. REC. 1033 (1921) (statement of Rep. Volstead noting that the object of the Capper-Volstead Act was to "modify the laws under which business organizations are now formed, so that farmers may take advantage of the form of organizations that is used by business concerns";  Md. & Va. Milk Producers Ass'n. v. United States, 362 U.S. 458, 466 (1960) ("[The Act] aims to equalize privileges by changing the law applicable to ordinary business corporations so the farmers can take advantage of it") quoting H.R. REP. NO. 67-24, at 2 (1921) . . . .

Dkt. No. 513, Mem. at pp. 3-4.  I observe that the Supreme Court in Maryland & Virginia Milk Producers Ass'n clearly stated that the language of §§ 1 and 2 of the Capper-Volstead Act and § 7 of the Clayton Act "shows no more than a purpose to allow farmers to act together in cooperative associations without the associations as such being 'held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws,' as they otherwise

Inc. v. N.Y. Shipping Ass'n, 602 F.2d 494, 519-522 (3d Cir. 1979) provides support for

defendants' proposition that it is unfair to penalize them for acting under a good faith belief that

their conduct was immune from prosecution.[17]  Dkt. No. 513, Mem. at pp. 4-5.  Finally, I am

also not persuaded by defendants' argument that dicta in Case-Swayne Co. v. Sunkist Growers,

Inc., 389 U.S. 384, 397 (1967) supports their argument that members of an agricultural

cooperative who act in good faith should not be subject to treble damage recoveries in private

antitrust cases because of membership mistakes or defects in the cooperative's structure.  Dkt.

No. 513 Mem. at pp. 5-6.  While Justice Harlan in his dissenting opinion observed that the mere

participation of non-grower "agency associations" in the cooperative did not eliminate Capper-

Volstead immunity, he also expressly conditioned his statement, observing that the immunity

may not be asserted "if the damage complained of resulted from attempts by the agency

associations [i.e., non-growers] to use their power . . . for their own benefit as distinguished from

that of the growers."  Case-Swayne Co., 389 U.S. at 538.  Defendants have not established that

such was the case with the EMMC's non-grower members.  See In re Mushroom, 621 F. Supp.

---

might have been."  362 U.S. at 465 (internal citations omitted).

[17]     The issue of good faith reliance on counsel was not before the Court of Appeals in
Consolidated Express nor considered by it in its decision.  The Court's holding was limited to the
specific retroactive application of an unforeseeable change in law.  It "recognized that [the
Clayton Act's § 4] damage remedy is effective as a deterrent only when its application to an
agreement can be foreseen by the parties at the time they [were] engaged in collective
bargaining."  Consolidated Express, 602 F.2d at 520.  The Court found that § 4's remedy had a
strong punitive element which was difficult to apply to conduct which the "parties had no reason
to believe would ever be held to be illegal, and may even have reasonably believed to be legally
compelled."  Id.  However, the Court specifically noted that its concern about illegality resulted
from an unanticipated shift in a National Labor Relations Board policy and "[a]ntitrust policy
may not be significantly advanced by giving retroactive effect" to such changes in application of
§ 4.  See id.

2d at 291 (finding that "[i]n this relationship, the price fixing does not protect the economic interests of the grower . . ." ).[18]  I therefore decline to grant reconsideration to defendants on the basis of their argument that summary judgment is warranted in their favor based on the affirmative defense of good faith reliance on the advice of counsel.

## III.    Certification for Appeal

I will certify my Order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).  Among the issues the Court of Appeals may wish to consider are:  First, whether Kaolin/South Mill and its distribution centers and/or LRP-M/Manfredini Enterprises constitute respective single entities. Second, whether M. Cutone is a non-grower despite its affiliation with M & V Enterprises such that its inclusion in the EMMC destroys the protection of the Capper-Volstead Act for defendants.[19]

---

[18]    Without explanation defendants also cite to In re Lower Lake Erie Iron Ore Antitrust Litigation, 759 F. Supp. 219 (E.D. Pa. 1991) aff'd in part, rev'd in part on other grounds, 998 F.2d 1144 (3d Cir. 1993), and USX Corp. v. Adriatic Insurance Co., 99 F. Supp. 2d 593 (W.D. Pa. 2000) aff'd, 345 F.3d 190 (3d Cir. 2003) as support for the proposition that a finding of liability is precluded by their "good faith belief that their conduct was exempt from § 1 of the Sherman Act and constituted the type of cooperative effort to manage supply that has been repeatedly encouraged by the Department of Agriculture . . . ." Dkt. No. 513, Mem. at p. 4 n.4.  I do not find these cases instructive.  In re Lower Lake Erie Iron Ore involved different antitrust violations and exemption from scrutiny under a different Act.  759 F. Supp. at 224-25 (involving a multidistrict litigation against a group of railroad defendants whose rates and charges were exempt from antitrust scrutiny under the Interstate Commerce Act, as amended by the Reed-Bulwinkle Act of 1948, 49 U.S.C. § 10701(a)).  USX Corp. was a suit brought by the owner of one of the railroad defendants in the In re Lower Lake Erie litigation seeking indemnification for liability arising of the civil antitrust actions by its insurers.  99 F. Supp. 2d at 600.  In USX Corp., the Court observed that the In re Lower Lake Erie Court "clear[ly]" believed that "good faith is not ordinarily an antitrust defense" and that the In re Lower Lake Erie Court submitted the question to the jury of whether the defendant may have been acting in the good-faith belief that it was carrying policies approved by the ICC only because of the specific "regulatory landscape in which [defendant] operated . . . . " Id. at 633.

[19]    I may certify this issue for appeal sua sponte.  See Amerisourcebergen Drug Corp.

Section 1292(b) provides in relevant part:

> When a district judge, in making in a civil action an order not
> otherwise appealable under this section, shall be of the opinion that
> such order involves a controlling question of law as to which there
> is substantial ground for difference of opinion and that an
> immediate appeal from the order may materially advance the
> ultimate termination of the litigation, he shall so state in writing in
> such order. The Court of Appeals . . . may thereupon, in its
> discretion, permit an appeal to be taken from such order, if
> application is made to it within ten days after the entry of the order
> . . . .

28 U.S.C. § 1292(b).

Under the statute, three elements are required for certification: (1) the order involves a controlling issue of law; (2) a substantial ground for difference of opinion exists regarding the resolution of the issue; and (3) an immediate appeal will materially advance the ultimate termination of the litigation. Katz v. Carte Blanche Corp., 496 F.2d 747, 754-55 (3d Cir. 1974). A controlling issue of law is one which either, if decided erroneously, would lead to reversal on appeal, or is "serious to the conduct of the litigation either practically or legally. And on the practical level, saving of time of the district court and of expense to the litigants [is] deemed . . . to be a highly relevant factor." Id. at 755. "Substantial grounds for difference of opinion exist where there is genuine doubt or conflicting precedent as to the correct legal standard." Hall v. Wyeth, Inc., No. 10-738, 2010 WL 4925258, at *1 (E.D. Pa. Dec. 2, 2010), quoting Bradburn Parent Teacher Store, Inc. v. 3M, No. 02-7676, 2005 WL 1819969, at *4 (E.D. Pa. Aug. 2, 2005). Finally, interlocutory review materially advances the litigation where the appeal may "eliminate the need for a trial, [or] simplify a case by foreclosing complex issues . . . ." In re Chocolate Confectionary Antitrust Litig., 607 F. Supp. 2d 701, 707 (M.D. Pa. 2009). Under

v. Meier, No. 03-6769, 2005 WL 2645000, at *3 (E.D. Pa. Oct.14, 2005) ("[W]e have the authority under § 1292(b) to certify our orders sua sponte"). Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd., 494 F. Supp. 1190, 1243 (E.D. Pa. 1980) (same).

§ 1292(b), the Court of Appeals' review "is not limited to the specific questions certified by the District Court.  Rather, [it] may address any issue fairly included within the certified order because it is the order that is appealable . . . ."  <u>PAETEC Commc'ns, Inc. v. MCI Commc'ns Servs., Inc.</u>, 784 F. Supp. 2d 542, 549 (E.D. Pa. 2011), <u>quoting</u> <u>NVE, Inc. v. Dep't of Health and Human Servs.</u>, 436 F.3d 182, 196 (3d Cir. 2006).

I previously declined to grant certification of an appeal from my Order of March 26, 2009 which denied defendants the protections of the Capper-Volstead immunity.  Dkt. No. 315.  I found that the defendants who requested certification had not shown "that this is an 'exceptional case' where it would be appropriate to permit a piecemeal appeal."  <u>Id.</u>  Defendants nevertheless took an appeal from my Order.  The Court of Appeals then dismissed their appeal for lack of jurisdiction and did "not opine on the validity of [my] holding that [the] EMMC was not properly formed under the Capper-Volstead Act because one of its members [M. Cutone] was not a grower of agricultural produce."  <u>In re Mushroom</u>, 655 F.3d at 163 n.2 (3d Cir. 2011).  In doing so, however, the Court of Appeals explained that "[t]here is no dispute that the question, whether the arguably inadvertent inclusion of an ineligible member strips an agricultural cooperative of Capper-Volstead protection, is both serious and unsettled."  <u>Id.</u> at 164 n.4.

With that explanation in mind, and upon reconsideration of my prior decision regarding the form and substance of both Kaolin/South Mill and its distribution centers and LRP-M/Manfredini Enterprises, and the effect of M. Cutone's inclusion in the EMMC on the availability of the Capper-Volstead exemption, I now find that certification is appropriate.  The parties' contrasting points of view on these issues are discussed at length above and reflect that there remains a substantial ground for a difference of opinion.  A different resolution of the questions regarding the applicability of the single entity/enterprise defense or the effect of M.

Cutone's inclusion in the EMMC may ultimately result in a contrary determination with respect to defendants' entitlement to Capper-Volstead Act protections and their liability for plaintiffs' claims under §§ 1 and 2 of the Sherman Act.  Further, an immediate appeal with respect to these questions may materially advance termination of this litigation.  In assessing the requirement of a likelihood of materially advancing the ultimate termination of the litigation, "[t]he district court's opinion about settlement possibilities, about the potential length of a possibly avoidable trial, and similar matters" is crucial.  Katz, 496 F.2d at 754.  A determination by the Court of Appeals with respect to the applicability of the Capper-Volstead immunity may either expedite the resolution of certain of the plaintiffs' claims or facilitate a settlement, saving the parties the needless expenditure of time and money in litigating issues that the Court of Appeals may vacate or reverse upon ultimate appeal.  See Bradburn, 2005 WL 1819969, at *4 quoting In re Microsoft Corp. Antitrust Litig., 274 F. Supp. 2d 741, 743 (D. Md. 2003) (stating that a refusal to grant interlocutory appeal could result in "a senseless waste of private and public resources and an unconscionable delay in the final resolution of these proceedings.") (internal quotations omitted).

An appropriate Order follows.